The RECTOR, WARDENS, AND MEMBERS OF THE VESTRY OF ST. BARTHOLOMEW'S CHURCH, Plaintiff,

v.

CITY OF NEW YORK, and Landmarks Preservation Commission of the City of New York, Defendants.

No. 86 Civ. 2848 (JES).

United States District Court, S.D. New York.

Dec. 13, 1989.

As Amended Jan. 24, 1990.

**960**

Mudge, Rose, Guthrie, Alexander & Ferdon, New York City (Douglas M. Parker, Judah Gribetz, Howard W. Goldstein, George A. Pierce, of counsel), Henry P. Monaghan, Kent Greenawalt, James G. Glazebrook, Chancellor of St. Bartholomew's Church, New York City, for plaintiff.

Cadwalader, Wickersham & Taft, New York City (Donald G. Glascoff, Jr., Joseph Polizzotto, Lisa J. Sotto, of counsel), for amicus curiae in support of plaintiff (New York State Interfaith Commission on Landmarking of Religious Property).

Cusack & Stiles, New York City (George J. McCormack, of counsel), for amici curiae in support of plaintiff (Roman Catholic Archdiocese of New York).

Hurley, Kearney & Lane, Brooklyn, N.Y. (Kevin M. Kearney, of counsel), for amici curiae in support of plaintiff (Roman Catholic Archdiocese of Brooklyn).

Jeffrey R. Notarbartolo, Brooklyn, N.Y., for amicus curiae in support of plaintiff (Committee of Denominational Executives).

Peter L. Zimroth, Corp. Counsel of the City of New York, New York City (Jonathan L. Pines, Lucy A. Cardwell, Asst. Corp. Counsels, of counsel), for defendants.

Simpson, Thacher & Bartlett, New York City (John J. Kerr, David W. Sussman, Elizabeth P. Johnson, of counsel), for amici curiae in support of defendants (The New York Landmarks Conservancy, Nat. Trust for Historic Preservation, Nat. Center for Preservation Law, Preservation Action, Fine Arts Federation, Preservation League of N.Y. State, and Women's City Club of New York, Inc.).

Mannarino Bader Bloom Fischer & Woll, P.C., New York City (Gerald D. Fischer, of counsel), for amicus curiae in support of defendants (Committee to Oppose the Sale of St. Bartholomew's Church, Inc.).

John Sexton, Norman Dorsen, New York City, for amicus curiae in support of defendants.

Cahill Gordon & Reindel, New York City (William E. Hegarty, Howard G. Sloane, David F. Freedman, of counsel), for amici curiae in support of defendants (The New York Landmarks Conservancy, National Trust for Historic Preservation, National Center for Preservation Law, Preservation Action, Fine Arts Federation, Preservation League of New York State, and Women's City Club of New York, Inc.).

## OPINION AND ORDER

SPRIZZO, District Judge:

Plaintiff, the Rector, Wardens and Members of the Vestry of St. Bartholomew's Church bring this action pursuant to 42 U.S.C. § 1983, for declaratory and injunctive relief and for damages. Plaintiff contends that defendants, City of New York and the Landmarks Preservation Commission of the City of New York ("Commission"), have violated its rights under the First, Fifth and Fourteenth Amendments to the United States Constitution, and under the laws of the State of New York. The Court has, by agreement of the parties, held a bench trial on the evidence previously submitted to the Commission in 1985 and 1986. After reviewing that evidence *de novo* and considering the law applicable thereto, the Court makes the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).[1]

## BACKGROUND

St. Bartholomew's Church is a Protestant Episcopal Church organized under the

---

1. The parties have set forth the evidence submitted to the Commission in the form of a twenty-three volume appendix ("App."). References to that evidence in this Opinion are to the volume and page number of that appendix, *e.g.,* 1 App. 246 refers to appendix volume one at page 246.

laws of the State of New York as a non-profit religious corporation. The Church building, designed by Bertram Goodhue, was completed in 1919, and is located on the east side of Park Avenue between East 50th and East 51st Streets in the City of New York. *See* 8 App. 2540; 10 App. 3432. Next to the church building is a seven floor community house constructed by Goodhue's successor firm during the years 1926–28. *See* 8 App. 2540, 10 App. 3433; 11 App. 4062. The community house provides, in combination with the church building, a home for a variety of social and religious activities in which the Church is engaged.[2] In addition to the two structures, the Church's Park Avenue property is improved by a garden and terrace area. *See* 11 App. 4062.

In March of 1967, the church, the exterior of the community house and the surrounding property were designated as landmarks by the Commission, a designation plaintiff did not then oppose.[3] *See* 8 App. 2540. Subsequently, however, plaintiff filed two applications with the Commission seeking a Certificate of Appropriateness under what is now N.Y. City Admin.Code § 25–307.[4] The first such application, filed in December 1983, sought permission to tear down the community house and erect in its place a fifty-nine story office tower. *See* Affidavit of Gene Norman ("Norman Aff.") at ¶ 21. This application was denied

as an inappropriate alteration on June 21, 1984. *See id.* at ¶ 25. The second application, filed in December 1984, sought to demolish the community house in favor of a forty-seven story office tower. *See id.* at ¶ 27; 8 App. 2470. This application was also denied as inappropriate on August 26, 1985. *See* Norman Aff. at ¶ 29. After the denial of plaintiff's second application, a further application to build the forty-seven story tower was made on September 3, 1985, on grounds of insufficient return pursuant to sections 207–4.0 and 207–8.0 of the New York City Administrative Code.[5] *See* 10 App. 3234.

The Commission held public hearings on plaintiff's third application on October 29, 1985, December 3, 1985, and January 21, 1986. *See* 2 App. 321; 3 App. 704; 4 App. 1114. At those hearings the Commission heard testimony from all interested parties, including expert witnesses who testified regarding the suitability of the community house to its charitable purpose, the extent and cost of necessary structural and mechanical repairs for both the church and community house, and the state of the Church's finances. In addition, the Commission received many reports from the testifying experts and other submissions. After the close of the last public hearing, the Commission met in Executive Session, open to the public, on February 6, 11, 18, 20, and 24, 1986 to discuss plaintiff's application, to accept further submissions from interested parties, and to take testimony

---

**2.** Among other things, the community house provides athletic facilities, including a pool and basketball court, a theatre, a pre-school for sixty students, meeting rooms, kitchen and dining facilities and office space. The church building, in conjunction with the community house, provides clothing, meals and sleeping quarters for the homeless. *See* 10 App. 3433–35.

**3.** The Church's ability to alter or demolish the buildings is restricted by a landmark designation. Any such alteration requires the approval of the Commission. *See* N.Y.Admin.Code § 25–305(a)(1).

**4.** Section 307(a) provides in relevant part: "the commission shall determine whether the proposed work would be appropriate for and consistent with the effectuation of the purposes of this chapter."

**5.** Section 207–8.0(a)(2)(c), now found at § 25–309(a)(2)(c), provides that a certificate of

appropriateness on the ground of insufficient return shall be granted when the applicant shows, *inter alia,* that: "such improvement has ceased to be adequate, suitable or appropriate for use for carrying out both (1) the purposes of such owner to which it is devoted and (2) those purposes to which it had been devoted when acquired unless such owner is no longer engaged in pursuing such purposes."

In addition, New York law requires that a certificate of appropriateness be granted where failure to do so would "prevent or seriously interfere" with the applicant's ability to carry out its charitable purpose. *See Society for Ethical Culture v. Spatt,* 51 N.Y.2d 449, 454–55, 415 N.E.2d 922, 925, 434 N.Y.S.2d 932, 935 (1980); *Lutheran Church in America v. City of New York,* 35 N.Y.2d 121, 131, 316 N.E.2d 305, 311, 359 N.Y.S.2d 7, 16 (1974).

and reports from the Commission's own *pro bono* consultants. *See* 5 App. 1537, 1638; 6 App. 1803, 1914; 7 App. 2117. After considering all of the evidence submitted, the Commission voted on February 25, 1986, to deny plaintiff's application. *See* Norman Aff. at ¶ 67. On October 10, 1986, the Commission issued its written determination denying the application. *See id.* at ¶ 68; 19 App. 6448.

Thereafter, plaintiff brought the instant action alleging the following constitutional claims: 1) that the landmark laws are facially unconstitutional to the extent they impact the property of any church because they interfere with the free exercise of religion in violation of the First Amendment; 2) that the landmark laws are facially unconstitutional because they treat charitable and commercial institutions differently in violation of the equal protection clause of the Fourteenth Amendment; 3) that the landmark laws are unconstitutional as applied to St. Bartholomew's as a consequence of the Commission's denial of their applications for a certificate of appropriateness, because that denial interfered with the free exercise of religion and because the denials constitute a taking of property without compensation; 4) that the landmark laws both facially and as applied to St. Bartholomew's violate the establishment clause by requiring an intrusive examination of the church's internal affairs in the hardship application process; 5) that the landmark laws both facially and as applied violate the doctrine of substantive due process by depriving the Church of its property's reasonable income production without a compelling state interest; 6) that the legal standards for designation of a landmark and for granting a certificate of appropriateness are impermissibly vague in violation of the due process clause of the Fourteenth Amendment; 7) that the lack of cross-examination of witnesses in the certificate of appropriateness procedure, the vagueness of the Commission's first two denial letters, the Commission's failure to consider economic hardship in the second application and the Commission's failure to allow plaintiff to submit responses to the Commission's witnesses all constitute due process violations. In addition, plaintiff brought state law claims for Article 78 relief alleging that the Church should have been granted a certificate of appropriateness under New York law.[6]

■ Plaintiff then moved for partial summary judgment on its claims of facial unconstitutionality, and defendant cross-moved for summary judgment.[7] These motions were later supplemented to add the issue of whether plaintiff's Article 78 claims were justiciable in a federal forum. The Court ruled on these motions in open court. Those rulings are recapitulated below in section I.[8]

## DISCUSSION

I. *Plaintiff's Claims of Facial Unconstitutionality*

A. First Amendment Claims

■ The Court rejects plaintiff's contention that the landmark laws unconstitution-

---

6. Plaintiff could have sought review of the Commission's factual and legal determinations in an Article 78 proceeding in New York State Supreme Court but elected not to do so. *See* N.Y.Civ.Prac. L. & R. § 7801 (McKinney 1981).

7. In addition to moving for summary judgment on plaintiff's claims of facial unconstitutionality defendants asserted that plaintiff's as applied claims were insufficient as well because plaintiff still retained some viable economic use of its property.

8. In addition to the summary judgment motions in this case, a motion to intervene on the side of the defendants was made by the Committee to Oppose the Sale of St. Bartholomew's ("Committee"), a group of church members opposed to the development project. The Court determined that intervention as of right was not appropriate because the members of the Committee had no ownership interest in the Church property itself, but at best only had the right to vote on the development issue in an intra-church proceeding. The Court also denied permissive intervention as a matter of discretion because, quite aside from the jurisdictional problems, caused by such intervention, that intervention would have seriously interfered with the parties' desire to expeditiously resolve the constitutional claims raised on the administrative record, and might well have led to collateralization of the issues and further discovery. *See infra* Discussion at II. In addition, the Court was persuaded that affording amicus curiae status to the putative intervenors provided an adequate substitute for permissive intervention.

ally interfere with the free exercise of the religious beliefs of any church that is designated a landmark. The gravamen of plaintiff's free exercise claim is that by restricting a church's ability to use its property as it wishes in support of its religious or charitable mission, the landmark laws impermissibly burden the exercise of religious belief.

That claim lacks merit. A statute abridges the free exercise of religion when it coerces the affected individuals into violating their religious beliefs or when "[it] penalize[s] religious activity by denying any person an equal share of the rights, benefits and privileges enjoyed by other citizens." *Lyng v. Northwest Indian Cemetery Protective Ass'n.*, 485 U.S. 439, 449, 108 S.Ct. 1319, 1325, 99 L.Ed.2d 534 (1988); *see also Tony & Susan Alamo Found. v. Secretary of Labor*, 471 U.S. 290, 303, 105 S.Ct. 1953, 1962, 85 L.Ed.2d 278 (1985); *Sherbert v. Verner*, 374 U.S. 398, 402, 83 S.Ct. 1790, 1792, 10 L.Ed.2d 965 (1963). A substantial interference with the free exercise of religion may also occur where church property is taken, even by condemnation, for state purposes. *Cf. Yonkers Racing Corp. v. City of Yonkers*, 858 F.2d 855, 871 (2d Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1527, 103 L.Ed.2d 833 (1989).

However, the mere possibility that a church may at some time want to make a different use of its landmarked property creates no more than an incidental burden on the practice of religion that does not "require the state to come forward with a compelling reason justifying its actions." *See Yonkers, supra*, 858 F.2d at 871. Therefore, the designation of church buildings as landmarks does not in and of itself violate the free exercise clause.[9] This is especially true since the landmark designation does not deprive the Church of the right to seek a certificate of appropriate-

ness to alter its property if the nature of that property is such that it no longer can be used to carry out its religious or charitable mission.

■ Plaintiff also contends that because the New York statutory and judicial tests for determining when a certificate of appropriateness may be granted on the grounds of hardship require an intrusive examination into the finances and internal workings of the Church, those tests, both on their face and as applied to St. Bartholomew's, result in an excessive entanglement between government and religion in violation of the establishment clause. While the establishment clause does prohibit excessive entanglement between government and religion, *see Lemon v. Kurtzman*, 403 U.S. 602, 619, 91 S.Ct. 2105, 2114, 29 L.Ed.2d 745 (1971), that doctrine has normally been applied in factual situations in which state aid to religious institutions requires extensive and continuous monitoring of church activities to ensure that government financing is being used solely for secular purposes. *See id.; see also NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 502–03, 99 S.Ct. 1313, 1319–20, 59 L.Ed.2d 533 (1979). That doctrine has no applicability where, as here, the government must make an inquiry into church finances for the limited purpose of determining the validity of a church's claim of financial hardship.

### B. Equal Protection Claims

■ Plaintiff alleges that because the landmark laws provide different hardship tests for commercial and charitable entities including religious institutions, they violate the equal protection clause. Because the Court has already found that the laws do not on their face impermissibly burden religion, any differences in treatment need

---

9. The Court also rejects plaintiff's contention that whenever a law has any impact upon a religious institution it must be justified by a compelling state interest. A compelling state interest is only required when the law impermissibly burdens the free exercise of religion. *See Yonkers, supra*, 858 F.2d at 871. Absent

such a burden the state need only show a rational basis for the legislation. The New York landmark laws have such a rational basis. *See Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 129, 98 S.Ct. 2646, 2661, 57 L.Ed.2d 631 (1978). Thus, plaintiff's substantive due process claims are without merit as well.

only be justified by a rational basis.[10]

As a threshold matter it should be noted that the equal protection clause only protects persons who are similarly situated from disparate treatment. Therefore, the differences between commercial entities and charitable institutions render that argument dubious at best. In any event, those differences clearly provide the state with a rational basis for treating those entities differently.

Since the hardship test for commercial enterprises is based upon the ability to earn a reasonable return from its property, it is obvious that a similar standard could not be applied to an entity which exists for charitable and not commercial purposes.[11] Indeed, it would make little sense, and might in fact be irrational, to apply the charitable test to a commercial property or the commercial test to a charitable property. It follows that the so called disparity in treatment is nothing more than a reasonable effort by the state to afford hardship relief to both classes of entities based upon criteria specifically tailored to the nature of each.

## C. Due Process Claims

█ Plaintiff also argues that the legal standards for designating a landmark and for granting a certificate of appropriateness are impermissibly vague and give the Commission virtually unfettered discretion in making its decisions. Therefore plaintiff argues the laws do not comport with the minimum requirements of procedural due process.

At the very least, due process requires notice and an opportunity to be heard. *See Mathews v. Eldridge*, 424 U.S. 319, 332–33, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976). The landmark laws unquestionably meet that standard in that they provide a property owner with adequate notice of the law's requirements and with the opportunity for an extensive hearing, especially in view of the interpretation placed upon those laws by the courts of New York. *See, e.g., Society for Ethical Culture v. Spatt*, 51 N.Y.2d 449, 454–55, 415 N.E.2d 922, 925, 434 N.Y.S.2d 932, 935 (1980); *Lutheran Church in America v. City of New York*, 35 N.Y.2d 121, 131, 316 N.E.2d 305, 311, 359 N.Y.S.2d 7, 16 (1974). It follows that since a reasonable person can and should know what standards must be met in bringing an application for a certificate of appropriateness or in opposing a landmark designation, those statutes are not impermissibly vague. *See Maynard v. Cartwright*, 486 U.S. 356, 361, 108 S.Ct. 1853, 1858, 100 L.Ed.2d 372 (1988).

While it is true that the procedures available at a landmark hearing are not the same as those available at a civil trial, that is not what due process requires. *See Mathews, supra*, 424 U.S. at 333, 96 S.Ct. at 901. Moreover, under New York law there is a right to judicial review of Commission decisions in the state court system, *see supra* note 6, a circumstance that further supports the rejection of plaintiff's due process claims.[12] *See Williamson*

---

**10.** Plaintiff also argues that its equal protection rights have been violated because the landmark laws treat landmarked and non-landmarked churches differently. This argument is at best an attack upon the general rationality of the landmark laws, an attack foreclosed by *Penn Central, supra.*

**11.** N.Y. City Admin.Code § 207–8.0(a)(1)(a), now § 25–309(a)(1)(a), permits commercial property to obtain a certificate of appropriateness on the ground of insufficient return if, *inter alia,* the landmarked building "is not capable of earning a reasonable return."

**12.** There is no need to resolve the merits of plaintiff's contention that the Commission violated its procedural due process rights during the hardship hearing. Those alleged defects could have, and should have, been addressed through an Article 78 proceeding in state supreme court. Moreover, plaintiff has expressly disclaimed any desire to have the matter returned to the landmark commission for a new hearing, which is the only relief that would be appropriate even if the Court were to accept plaintiff's argument that *this hearing*, as opposed to the standard applicable to such proceedings in general, deprived the church of procedural due process. In view of that circumstance, the Court will treat that claim as abandoned. For the same reason, the Court will not decide the merits of whether Article 78 relief can constitute a claim cognizable in a federal court, an issue that has caused some difficulty. *Compare Cooney v. American Horse Shows Ass'n*, 495 F.Supp. 424, 433 n. 7 (S.D.N.Y.1980)

*County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 194–95 & n. 14, 105 S.Ct. 3108, 3120–21 & n. 14, 87 L.Ed.2d 126 (1985).

In sum, the Court rejects plaintiff's contentions that the landmark laws are unconstitutional on their face as to all churches, and grants summary judgment for defendants as to those claims.

## II. *The Trial of this Action*

Although concluding that partial summary judgment should be granted for defendants on plaintiff's claims of facial unconstitutionality, the Court held a trial with respect to plaintiff's claim that the landmark laws were unconstitutional as applied. Plaintiff's contentions in that regard are twofold: (1) that because it could no longer carry out its religious mission in its existing facilities the denial of its hardship application constituted a taking of its property without just compensation; and (2) the denial of that application constituted an impermissible burden on the exercise of its religious beliefs.

Initially, the Court was of the view that it could have a trial *de novo* and consider facts not before the Commission in deciding whether the landmark laws had been unconstitutionally applied to plaintiff. Subsequently, the Court reconsidered this view and concluded that it would be inappropriate to predicate a finding of unconstitutionality on facts which the Commission never had an opportunity to consider, especially since under the statutory scheme, a new application for hardship exemption can be made at any time based upon additional facts.[13] Therefore, the Court, as requested and consented to by the parties,[14] will evaluate this claim solely on the bais of the record before the Commission.[15] However, since the Court is presented with a claim of consti-

with *Herrmann v. Brooklyn Law School*, 432 F.Supp. 236, 239–40 (E.D.N.Y.1976).

**13.** Indeed, it would hardly be consistent with the principles of comity and federalism that require a federal court to abstain where a remedy may be provided by state law without reaching the constitutional issues, *see Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 500–501, 61 S.Ct. 643, 645, 85 L.Ed. 971 (1941), for this Court to deprive the Commission of the opportunity conferred upon it by state law to determine whether new facts support plaintiff's hardship application as a matter of state law.

**14.** The putative intervenors did not either request or consent to that procedure.

**15.** Defendants contend that under *University of Tennessee v. Elliot*, 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986), the Court must not only confine itself to the administrative record, but must also give preclusive effect to the factual findings of the Commission. *Elliot* requires that when a state agency acting in a judicial capacity resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the courts of that state. *See id.* at 798–99, 106 S.Ct. at 3225–26.

However, whether a proceeding is to be regarded as judicial for purposes of *Elliot* preclusion is a question of federal law. Moreover, the fact that a proceeding may meet the minimum requirements of due process does not necessarily require that it be afforded preclusive effect. In addition, state law must require that the proceeding be afforded preclusive effect before the federal issue need even be reached.

The Court is unpersuaded that, as a matter of federal law, landmark proceedings should be regarded as quasi-judicial in nature. Indeed, they are more akin to town meetings than judicial proceedings, in that all may be heard regardless of the relevance of their testimony, evidentiary rules do not apply, and questioning by the attorneys for the interested parties is not permitted.

In any event, it does not appear that New York law would require that a decision of the Commission be given preclusive effect. Under New York law, a proceeding is quasi-judicial and therefore entitled to preclusive effect if the agency is authorized to act in an adjudicatory fashion, the procedures it employs are sufficient to permit confidence that the facts and issues were fully tested, and the parties reasonably expected to be permanently bound by the result reached. *See Allied Chemical v. Niagara Mohawk Power Corp.*, 72 N.Y.2d 271, 276–77, 528 N.E.2d 153, 155, 532 N.Y.S.2d 230, 232 (1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 785, 102 L.Ed.2d 777 (1989). Where, however, an agency makes findings based upon conditions which are subject to change and further review, New York is not likely to give those proceedings preclusive effect. *See id.* An application for a certificate of appropriateness based on hardship appears to be such a proceeding. There is no limit on the number of applications which may be made, and an applicant's economic condition, which is likely to change over time, will affect the likelihood of success of the application. Thus,

tutional deprivation, it must make a *de novo* review of that evidence.[16]

### III. *Plaintiff's Unconstitutional As Applied Claims*

#### A. Just Compensation Claims

Plaintiff's claim of unconstitutionality as applied depends upon plaintiff's ability to prove that it can no longer carry out its religious mission and charitable purpose in its existing facilities because those facilities are inadequate and because it cannot afford to expend the sums necessary to make those facilities adequate. It is that circumstance that underlies plaintiff's contention that the denial of its hardship application deprived it of its property without just compensation in violation of the Fifth Amendment and abridged its right to freely exercise its religious belief in violation of the First Amendment.

At the outset it should be noted that the Supreme Court has never passed upon the constitutionality of a regulation, such as the landmark laws, as applied to the property of a charitable or religious institution. However, in dealing with commercial property, the Supreme Court has recognized that there is no magic formula for determining when a taking has occurred. *See Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 123–24, 98 S.Ct. 2646, 2658–59, 57 L.Ed.2d 631 (1978). Factors of particular significance, however, are the economic impact of the government action, *i.e.*, its interference with legitimate investment expectations, and the character of the government action, *e.g.*, is the action a physical taking or a land use regulation. *See id.* at 124, 98 S.Ct. at 2659. These factors must be evaluated in light of the overriding rule that the Fifth Amendment contemplates continued use of a property as it was used in the past, and thus permits no substantial interference with the property owner's primary investment expectations or reasonable beneficial use. *See id.* at 136, 98 S.Ct. at 2665.

While the concept of legitimate investment expectation is not directly transferable to a charitable or religious institution, the concepts of reasonable beneficial use and the owner's primary expectations are equally applicable to both. Moreover, the New York Courts have developed a takings standard for charitable institutions embodying these concepts that is a constitutionally acceptable standard for determining when there has been a taking of charitable property, *i.e.*, where the landmark designation would prevent or seriously interfere with the carrying out of the charitable purpose of the institution. *See Society for Ethical Culture, supra,* 51 N.Y.2d at 454–55, 415 N.E.2d at 925, 434 N.Y.S.2d at 935; *Lutheran Church in America, supra,* 35 N.Y.2d at 131, 316 N.E.2d at 311, 359 N.Y.S.2d at 16. Therefore, the Court adopts this test to determine whether plaintiff's Fifth Amendment rights were violated as a consequence of the denial of its hardship application.

#### B. Free Exercise Claim

■ Assuming arguendo that plaintiff's charitable work is the exercise of religion for First Amendment purposes, plaintiff must prove that it can no longer carry out this work in its existing facilities to sustain its free exercise claim. *See Lyng, supra,* 108 S.Ct. at 1326; *Yonkers, supra,* 858 F.2d at 871–72. Thus, in this case, the First Amendment inquiry is identical in

---

an application once denied may be pursued again with a different result at a future date.

Moreover, in a case decided by the New York Court of Appeals prior to the *Elliot* decision, that court found that Landmark designation hearings are not quasi-judicial for purposes of determining what type of Article 78 review they will receive. *See Lutheran Church in America, supra,* 35 N.Y.2d at 128 n. 2, 316 N.E.2d at 309 n. 2, 359 N.Y.S.2d at 13 n. 2. The Court based

that holding upon the fact that designation proceedings are not adversary hearings involving cross-examination. *See id.* Certificate of appropriateness hearings share these characteristics.

**16.** It is, of course, plaintiff's burden to prove by a preponderance of the evidence that its constitutional rights have been violated on the basis of that record, even though some of the evidence at the hearing may not have been admissible at a federal civil trial.

scope to the Fifth Amendment inquiry, since to prevail on either claim plaintiff must prove that it can no longer carry out its religious mission in its existing facilities.

The Court has examined the record before the Commission in an effort to determine if plaintiff has proved by a preponderance of the evidence that it can no longer carry out its charitable purpose in its existing facilities. For the reasons that follow, the Court finds that plaintiff has failed to carry that burden, and that judgment must be entered for the defendant.

### C. Findings of Fact

Plaintiff contends that the community house is an inadequate structure for carrying out the Church's religious mission and charitable purpose. Plaintiff further alleges that both the community house and the church are in an advanced state of disrepair and cannot be rehabilitated for less than $11 million. Thus, plaintiff argues it can only rehabilitate the Church and carry out its charitable purpose if it is allowed to demolish the community house, build the office tower in its place, and reap the revenues therefrom. Finally, plaintiff contends that its finances are in such a deplorable state that even if the two buildings could be rehabilitated for less than $11 million, it cannot afford to spend more than a minimal sum upon such work. The Court will address each of these contentions in turn.

### 1. *Adequacy of Community House Space*

Plaintiff's first factual contention concerns the amount of the space contained in the community house, and the configuration of that space in relation to the needs of the Church's programs. Plaintiff contends that the evidence shows that: the usable

space available in the community house is insufficient to accomodate the variety of activities that compete for the space; that it wishes to expand its existing programs but cannot do so given those space constraints; that it is forced to conduct activities in spaces that are inappropriate for those activities;[17] and that renovation of the interior of the community house is impractical and not feasible.

Plaintiff relies primarily upon an analysis of the use and configuration of the community house space undertaken at plaintiff's request by Walker Associates, an interior design firm. In addition to the testimony of its president, Keith Keppler, *see* 2 App. 462; 15 App. 5275, Walker submitted three reports to the Commission, *see* 10 App. 3429; 14 App. 4843; 16 App. 5586. In those reports and testimony, Walker concluded that the community house is not adequate, suitable or appropriate for the purposes to which it is devoted. *See* 10 App. 3431–32. Walker found that the community house lacked sufficient usable space, that the existing usable space was inefficiently designed and poorly distributed, and that the multiplicity of uses of that space created scheduling conflicts.[18] *See id.*

In addition, Walker concluded that the building's structure was outmoded and inflexible, and that renovation of the structure's interior was impractical and prohibitively expensive due to the massive structural systems within the building, the elevator shafts and support structures, and the impossibility of demolishing thick load bearing walls. *See id.* at 3432. In sum, Walker found that the Church could only continue to successfully carry out its charitable and social activities by moving to

---

**17.** A focal point of plaintiff's contention in this regard is its claim that it is forced to carry out its feeding program for the homeless from the church mortuary chapel, and thus must carry food from the community house kitchen downstairs and the length of an entire city block to reach the church. In addition, the Church contends that it cannot continue to provide shelter for the homeless in the church narthex because that space is inappropriate, and because it can

only provide shelter for ten persons per night in that area. *See* 2 App. 380, 382–85.

**18.** Specifically, Walker found that the community house contained a net usable area of approximately 38,000 sq. ft., that the Church programs required a usable area of approximately 46,000 sq. ft., leaving a space deficit of approximately 8,000 sq. ft. *See* 2 App. 492.

another more suitable facility, and that the proposed forty-seven story office tower was such a facility. *See* 4 App. 1321–22; 10 App. 3432.

However, the Court, based upon flaws in Walker's methodology and upon conflicting evidence, finds that Walker's conclusions are incorrect, and that plaintiff has failed to prove by a preponderance of the evidence that the community house is unsuitable for its current use.

The credibility and accuracy of Walker's findings are undercut by several factors. First, it is clear that Walker did not attempt to examine the building plans of the community house before it determined that the building could not be easily altered. *See* 3 App. 916. If it had done so, it would have found that in fact the building does not contain massive load bearing walls, but instead is a light steel frame structure that is easily susceptible to alteration.[19] *See* 4 App. 1240; 16 App. 5721–22. Second, Walker based its finding of inadequate usable space upon calculations appropriate to a commercial office building, the area of Walker's expertise, and not upon calculations appropriate to plaintiff's facility. *See* 6 App. 1956; 7 App. 2186. Third, measuring the adequacy of space in an existing building was an unusual task for Walker, which was used to projecting space for designs of proposed buildings.

In addition, Walker conducted its study by asking questions of the heads of each program using the facility, and, unsurprisingly, found that each program head thought he or she needed more space. *See* 14 App. 4853. Moreover, examination of the questionnaires used reveals that they fail to distinguish between program needs and mere desires for expansion. Furthermore, Walker presented no evidence of objective observations of how the facility is actually used over time. The Court finds

therefore that Walker's conclusions are without adequate factual support.

Moreover, other evidence demonstrates that the community house is adequate for the purposes to which it is devoted. Weekly building activity schedules, if anything, supported the conclusion that the community house's space was in fact underutilized, that many of the rooms were not used at all during the day, or were used by very few, and that no scheduling conflicts were apparent. *See* 12 App. 4431–33; 13 App. 4736.[20] In fact, the Church was able to rent out some of its space to area businesses, and has formed a special committee to increase those rentals. *See* 13 App. 4733–34. Moreover, although plaintiff complained that it could accommodate only sixty pupils in its preschool, it has an occupancy permit for one hundred pupils, and therefore underutilizes the capacity of even its preschool facilities. *See* 7 App. 2223; 15 App. 5786.

Walker's conclusion that the community house is inefficiently configured is belied by the fact that it failed to consider inexpensive methods of reconfiguring large rooms, for example, by installing removable room partitions. Finally, the Commission's own calculations reveal that even accepting Walker's estimate of the space needed to conduct current activities, the community house's space deficiency was much lower than Walker's estimate, and that any deficiency could be made up at relatively low cost by utilizing the basement as a storage area. *See* 17 App. 5800.

The credibility of plaintiff's evidence is further undercut by the fact that its proposed new building, which reverses the proportion of space above and below ground in the existing facility, would be only marginally better, if at all, in terms of usable space, *see* 3 App. 893–94, and significantly inferior in many other respects such as the quality of the below ground environment, the choked single access point of the office

---

**19.** For this reason, and because it was unsupported by any evidence, the Court also rejects Walker's contention that interior renovation of the community house would cost approximately $3.4 million.

**20.** Testimony also indicated that Church membership, and membership in the community club, a primary user of the community house, has been steadily declining. *See* 12 App. 4389–91.

building lobby,[21] and the absence of any plan to encompass the ministry to the homeless in the new structure, which oddly enough is a program that plaintiff asserts it does not have adequate space for in the present structure.[22] *See* 7 App. 2201–10. In sum, plaintiff's reliance upon the Walker report and the Court's rejection of that report supports the conclusion that plaintiff has failed to show by a preponderance of the evidence that the community house is an inadequate structure for conducting its activities.[23]

### 2. *Required Exterior and Mechanical Repairs*

Plaintiff's second major factual contention is that the community house and the church building both require a complete overhaul and replacement of existing mechanical systems, and substantial repair and replacement of exterior structural systems at a cost of approximately $11 million. Plaintiff's sole support for this proposition is a study of the mechanical systems and the building exteriors undertaken in 1985 by O'Brien, Krietzburg and Associates ("OKA"), a firm of professional construction managers, submitted through two reports, *see* 10 App. 3281; 14 App. 4951, and the testimony of OKA's president, James O'Brien, *see* 2 App. 413; 4 App. 1205, 1341. In formulating its recommendations, OKA relied upon the report of Edwards & Zuck, P.C., who evaluated the plumbing, mechanical and electrical systems, *see* 10 App. 3367, the report of Caine, Farrell & Bell,

architects, who examined the exteriors, *see id.* at 3388, and the report of Barr & Barr, Inc., builders, who provided cost estimates of the repairs. *See id.* at 3396.

Based upon these three reports, OKA concluded that poor maintenance programs in the past have caused the overall exterior physical condition of the buildings to seriously deteriorate, and that the buildings' mechanical systems were outdated and in some cases inoperative. *See id.* at 3286–87. OKA's prescription for these ills involves virtually complete replacement of mechanical, electrical and plumbing systems and significant replacement of exterior elements. *See id.* at 3298–3366. Rehabilitation of existing systems was not considered. The total cost of these repairs and replacements was estimated by OKA to be $11,663,500, on the assumption that construction was to be completed within two years. *See* 14 App. 4956–63.

The Court does not find OKA's assessment persuasive for the following reasons. First, it is clear from the testimony of Ronald Alexander, a former vestryman in charge of the Church's building committee, that OKA was told to maximize the cost of estimates to the greatest defensible extent, and that OKA undertook to do just that by advocating replacement over rehabilitation wherever possible. *See* 3 App. 724. Moreover, OKA admitted a bias in favor of replacement,[24] and indeed had little experience in rehabilitating older buildings. In addition, OKA did not rely on a full set of plans and specifications in evaluating nec-

---

**21.** Plaintiff complained that the community house's two entrances, providing access space of 700 sq. ft., are inadequate, but the proposed building has a single access point with an area of 450 sq. ft., and must be shared with the rest of the occupants of the forty-seven story tower. *See* 7 App. 2201.

**22.** In addition, plaintiff has failed to show why the existing community house dining facilities, or even the auditorium, could not replace the church mortuary chapel as the site of the breakfast feeding program for the homeless. Both of those facilities are much closer to the kitchen and are never used in the morning.

**23.** In fact, the Church did not commission the Walker space study until the Spring of 1985, long after plans for the new building had been drawn. *See* 4 App. 1307. This fact supports the

view that the Church's claim that the building is inadequate was an afterthought designed to provide another argument for demolishing the building after its first two attempts to get the proposed construction approved had failed.

This point was aptly made by Commissioner Halsband: "in this case the new building was made in the absence of a program—the program was done last—and that whole intermediate step of comparing what you've got to what you need seems to never to [sic] have been expressed...." 6 App. 1936.

**24.** For example, Mr. O'Brien stated that in his view he would "come in and gut the whole thing, because there was nothing worth saving." 4 App. 1349.

essary repairs. *See* 4 App. 1367–68. Instead, OKA relied solely on the reports of other firms who were not called to testify before the Commission.

These reasons would be a sufficient basis to reject OKA's conclusions. There is, however, ample additional evidence to show that not only did OKA grossly overestimate the amount of work required, but that its method for allocating costs to that work is seriously flawed. For example, OKA recommended wholesale replacement of the church's front steps and the blue stone steps leading from Park Avenue to the terrace. *See* 10 App. 3312. However, other evidence showed that only the top platform of the church steps and one of the blue stone steps required replacement. *See* 5 App. 1641. Similarly, OKA advocated replacement of all of the sidewalk when only part of the sidewalk was cracked and in need of repair.

In estimating the required roof repairs, OKA ignored the fact that individual tiles could be reused in repairing the tile roofs, *see* 5 App. 1681–82, and that several of the flat roofs had been recently replaced and thus did not need to be replaced again. *See* 5 App. 1687; 13 App. 4656–57. All of these facts tend to show that the OKA report was not based upon careful examination and consideration of what repairs were truly necessary, but instead upon the presumption that all problems should be solved by complete replacement. *See* 12 App. 4632. Thus, the Court finds OKA's evaluation of necessary exterior repairs incredible and unpersuasive.

Similar flaws are apparent in OKA's evaluation of necessary repairs to the buildings' interior mechanical systems. Since OKA claimed to rely on Edwards & Zuck, it is especially pertinent to note that OKA in fact departed from the recommendations of that report. For example, while Edwards & Zuck recommended retaining and modifying existing ductwork in the community house, *see* 10 App. 3371, OKA estimated that most of the ductwork had to be replaced. *See id.* at 3349–50.

This selective reliance on Edwards & Zuck supports the inference, absent some other basis for the estimate, that OKA was guessing at what repairs were truly necessary. This inference is supported by other OKA estimates as well. For example, OKA advocated wholesale replacement of the electrical systems, ignoring the fact that much of that work had already been accomplished. *See* 6 App. 2033; 10 App. 3361–62. Indeed, OKA did not even know that there were no outstanding fire code violations, and therefore made recommendations which incorrectly assumed that the auditorium balcony and the church basement had not been brought up to fire code standards. *See* 10 App. 3308–11. Similarly, OKA's sprinkler system estimate ignored areas of the community house that already had sprinkler systems, and included costs for a sprinkler system based upon a square footage estimate for the entire building.

Moreover, OKA's report evidenced a total lack of familiarity with what could be accomplished by retaining and refurbishing existing mechanical systems. Rather than undertaking a detailed analysis of the plumbing, electrical and heating ventilation and air conditioning systems to determine what could be salvaged, OKA simply opted to replace it all. In so doing OKA ignored, for example, the advantages to be gained by retaining the direct current electrical systems, and the virtually unlimited service life of older properly maintained equipment. *See* 16 App. 5749.

In sum, it is clear from OKA's report that their object was not to determine what repairs were truly necessary or required, but to maximize the amount of work and the cost of that work. There is simply no other explanation, and none has been offered, for OKA's wholesale reliance upon replacement and complete rejection of rehabilitation, especially since there is abundant evidence that many of the systems examined could in fact be rehabilitated.

Quite aside from the defects in OKA's analysis noted above, OKA's method of estimating costs is highly questionable. In estimating costs, OKA relied first upon the cost estimates of Barr & Barr, and second upon its own comparison of the Barr &

Barr estimate to those contained in R.S. Means Co., Means Cost Data (1985 ed.), a standard reference work for construction cost estimates. *See* 14 App. 4955. The Means handbook provides cost estimates for a given type of work, *e.g.*, electrical system replacement, on a per square foot of building space basis. *See id.*

While this may be an acceptable method of estimating costs for new construction where there is no existing structure, it is not, as several experts testified, either an appropriate or accurate method of estimating costs in an existing facility because the square foot method fails to account for elements in the existing structure that can be used and adapted to fit in with the rehabilitative work. *See* 3 App. 849, 879, 910, 923; 6 App. 2035. Thus, cost estimates based on a square foot calculation are likely to overstate the actual cost of repair and rehabilitation, or for that matter, replacement.[25]

OKA's estimates are also suspect because they are based not upon first hand examination of the facilities, but upon Barr & Barr's estimates, and Barr & Barr was never called to testify before the Commission to explain their calculations. In addition, the Court finds that OKA overstated its costs by including a 1.67 multiplier for interior work on a landmark when the interior of the community house is not landmarked. *See id.* at 2002. Similarly, OKA included a twelve percent addition for architectural and engineering fees that is not only well above the industry average for such fees, *see* 13 App. 4624, but also applied that fee to types of work that do not

normally require such expertise. *See* 6 App. 2003.[26]

### 3. *The Contradictory Evidence*

It should also be noted that substantial evidence contradicting OKA's findings was submitted by the Committee to Oppose the Sale of St. Bartholomew's Church ("Committee to Oppose"), *see* Report of John Altieri, 13 App. 4656; Report of Robert Silman Assoc., P.C., 7 App. 2182, 13 App. 4628, 16 App. 5721; Report of the Ehrenkrantz Group, P.C., 13 App. 4632; Report of James Stewart Polshek and Partners, 13 App. 4620, 16 App. 5709, and by the Commission's own *pro bono* consultants. *See* Report of Polonia Restoration Co., Inc., 16 App. 5731; Report of the Department of General Services of the City of New York ("DGS"), 16 App. 5743. The Court relies on this evidence as well in concluding that OKA's estimates are neither persuasive or credible.

### (a) The Mechanical System

Mr. Bronson Binger and a team from DGS were clearly the experts most qualified to pass upon the costs of renovating an older building since they make approximately one hundred such estimates every year. *See* 6 App. 2036. Even more significantly, Mr. Binger personally participated in the renovation of the Church of the Heavenly Rest, a building also designed by Goodhue, and was thus intimately familiar with St. Bartholomew's mechanical systems.[27] *See id.* at 1859–60.

In conducting his assessment, Binger assembled a team which included an electrical engineer, a heating ventilation and air con-

---

**25.** One witness testified that OKA's cost estimates were as much as three times too high. *See* 6 App. 2003.

**26.** The Court also finds OKA's insistence on compressing the work into a two year period to be unreasonable. While this recommendation obviously serves to magnify the financial hardship to the Church by requiring large expenditures in a short period of time, it would also require, in all likelihood, severely restricting the use of the facilities to accomplish major repairs. In addition, the recommendation ignores fiscal reality as well. A more reasonable approach, and the one used by other organizations, would be to do the most essential work first, and

spread the expenditures out over a longer period of time.

**27.** The Church protests that it cannot be expected to perform the miracles that Mr. Binger performed for the Church of the Heavenly Rest. Quite aside from the fact that Mr. Binger's achievements, although impressive, are not miraculous, Mr. Binger volunteered to assist the Church *pro bono* in carrying out the recommended repairs and rehabilitation. *See* 6 App. 2018; 16 App. 5751. Given the Church's claim of financial hardship, it is difficult to understand why it has not accepted this offer.

ditioning engineer, a plumbing engineer, and a cost estimator experienced in each of those areas. *See id.* at 1858–59. Binger's team approached the problem by examining each piece of equipment individually, determining what the life expectancy of each piece was and what needed to be replaced, and then pricing out the work for each piece individually. *See id.* at 1863.

Binger's conclusion was that although St. Bartholomew's has deteriorated, it is operable. *See id.* He also concluded that if the existing equipment is refurbished, much of it has an unlimited useful life; that the equipment that has deteriorated can generally be rebuilt for less than the cost of new equipment; and that much of the existing equipment can be made servicable for relatively small amounts of money over a period of years. *See id.* at 1863–66.

Although Binger acknowledged that his estimate was preliminary, and that older mechanical systems do require knowledgeable maintenance personnel, the Court finds Mr. Binger's estimate to be the most credible and persuasive evidence presented to the Commission.

Binger also concluded that those items that had to be repaired immediately included repairs to the steam meter room, the condenser water system, the D.C. fan motors, the exhaust systems, the Organ, and the heating and plumbing systems at a total cost of $398,000. *See* 16 App. 5747–48. He estimated that further improvements to those and other systems should be undertaken over the next two to ten years at an additional cost of $400,000, and that further elective improvements could be undertaken if finances permitted at a cost of $632,000. *See id.* In all, Binger's estimates that the church and community house mechanical systems could be put into excellent shape for $1,430,000. *See id.*

### (b) The Exterior Work

Other than the OKA report, the only other evidence of the cost of exterior repairs submitted to the Commission was the report of the Polonia Restoration Co., Inc., a corporation specializing in exterior renovation. *See* 16 App. 5731. Although Polonia's methodology was not detailed in the fashion of Binger's methodology, it appears that Polonia considered repair as an alternative to replacement, and provided cost estimates based on the actual work to be done rather than on a square foot basis. *See* 16 App. 5731–38. The Court concludes, therefore, that Polonia's estimate is the most credible and reasonable assessment of the work required on the exterior of the building.

While Polonia agreed that most of the exterior areas addressed by the OKA report needed attention, Polonia differed as to the extent of the work necessary, whether there should be repair rather than replacement, and differed substantially as to cost. Polonia concluded that it would be appropriate to carry out exterior repairs over five years, and that essential repairs could be accomplished at a cost of $1,141,903 with further optional repairs costing $514,000, for a total cost of 1,655,903. *See id.* at 5734.

Thus, if the Binger estimate for interior work of $1,430,000 is added to Polonia's estimate of $1,655,903 the total cost of renovation for both buildings is approximately $3,085,903 phased in over a period of several years. This estimate is, of course, drastically lower than the OKA estimate. The Church contends, however, that it cannot afford to expend even three million dollars on repairs and replacement.

### 4. *The Church's Financial Condition*

Plaintiff contends that even if it could put the church and the community house in good working order for $3 million, its financial circumstances do not permit it to expend that amount of money while it continues to run its other programs. The Court rejects this contention as unsupported by the evidence produced before the Commission.

There is little disagreement in the record over the size of the Church's endowment. Although subject to fluctuations in the stock market, the market value of the Church's portfolio stood in excess of $12.5

million at the end of 1985.[28] *See* 16 App. 5487, 5646. Its total funding for 1984 was $14,355,000, including other operating revenues. *See* 2 App. 598. While this sizeable endowment would appear on its face to be capable of supporting a capital expenditure of $3 million, plaintiff contends that much of that endowment cannot be expended under New York law, and much of the rest of the endowment is restricted for specific purposes.[29]

Although this contention may be true in a general sense, plaintiff has failed to recognize that some of the restrictions permit the use of these funds to support of the church building and the community house. These funds could therefore be used for necessary capital expenditures. Moreover, these funds if used for this purpose could free up unrestricted funds that have been designated by the vestry for the same purpose.

One witness before the Commission estimated that as much as $6 million of the endowment could be used for capital expenditure purposes. *See* 6 App.1971. Of that $6 million, $2.9 million is expendable for specific purposes, and $3.1 million at the discretion of the vestry. *See id.* Plaintiff's own accountants reported that of the Church's $12 million endowment, $2.7 million was expendable for designated purposes, $4.5 million was unrestricted and $4.8 million was restricted as to principal.

*See* 13 App. 4569; *see also* 4526–27. Thus, the Court finds plaintiff's claim that because parts of the endowment are restricted it cannot use some of them for capital projects to be incredible and unsupported by the evidence.

The Church also contends that if it takes $3 million out of its endowment, it will be unable to operate its other programs due to loss of income from the endowment. While it is true that income from the endowment makes up a significant portion of the Church's $3 million annual operating revenue, *see* 15 App. 5392, that claim is unpersuasive for the following reasons.

First, the Church does not have to remove $3 million from the endowment all at once. The endowment could be depleted gradually over a period of years as the work on the church and the community house is performed.[30] Gradual depletion would not only lessen operating revenue lost due to lower dividend and interest income, but would also allow capital appreciation to offset the yearly withdrawals. Second, the Church has, over the last ten years operated at close to a break even level, showing surpluses in some years and losses in others. *See* 2 App. 510; 10 App. 3484–87.[31]

Moreover, it has done so while spending more than $1.6 million on expenses related to the development of the office tower.

**28.** In addition to its endowment assets, the Church owns a twelve room cooperative apartment at 860 Park Avenue which it uses as a residence for its minister, Reverend Thomas Bowers. Although that asset is carried on the books at $104,000, estimates of its market value range much higher. *See* 12 App. 4378.

**29.** The endowment is restricted by law in two ways. First, New York law prohibits expenditure of those parts of the endowment restricted by the donor unless the donor consents or the not-for-profit corporation obtains a judicial release. *See* N.Y. Not-for-Profit Corp. Law § 522 (McKinney Supp.1989). Second, New York law restricts expenditure of those parts of the endowment designated by the donor for specific purposes to expenditure for those purposes. *See id.* New York law leaves the spending of unrestricted funds, such as the net realized gains on an endowment, to the sound discretion of the vestry. *See id.* In addition, some of the endowment has been designated by the vestry

for specific purposes. However, the vestry is permitted to redesignate that money at any time.

**30.** Both the Binger and Polonia estimates sensibly provided that work should be phased in over several years with the most urgently needed repairs taking precedence. This is the normal practice for undertaking major renovation work, primarily for financial reasons. *See* 3 App. 906–07; 16 App. 5747. In addition, the Church never established that it could not borrow a lump sum against its endowment and amortize the loan over an even longer period. *See* 5 App. 1777.

**31.** This is true in spite of the fact that the Church budget does not distinguish between operating and capital expenditures, *see* 16 App. 5673, and thus some of the amount reflected as operating expenses may in fact be capital expenditures.

*See* 13 App. 4655; 16 App. 5637. These facts not only show that the Church is able to make use of large amounts of endowment income for discretionary spending, but also constrain the Court to reject plaintiff's contention that it has been forced to make drastic cutbacks in operating expenses because current revenues from endowment income are insufficient to fund the Church's programs.

Finally, the Church has presented no evidence to show what effect withdrawals from the endowment would have on its operating budget. In fact, it did not provide the Commission with any financial projections that would enable this Court to determine its future financial prospects. This failure is fatal to plaintiff's claim of prospective financial hardship.

Not only has the Church failed to provide such financial projections, it has failed to consider either the possibility of a capital fund raising project or the possible sale of the Church's air rights to a nearby building. Plaintiff's own expert testified that he thought a successful fund raising drive could raise as much as $2 million over a period of years. *See* 2 App. 517–18; 11 App. 3741–42. Although plaintiff vaguely asserts that such a campaign met with failure in 1980, plaintiff has failed to submit any proof to support this contention, and has, as noted above, submitted proof through its own expert supporting a contradictory inference. The Court finds, therefore, that fund raising is at least a reasonable alternative that must be explored before plaintiff's claim of financial hardship can be accepted as credible.[32]

**32.** The reasonableness of this alternative is amply illustrated by the experiences of other churchs and synagogues that have conducted successful capital fund raising campaigns. *See* 17 App. 5846–76.

**33.** Air rights refer to the right to develop buildings surrounding the Church property in a way that would intrude upon the air space which is otherwise part of the Church's property interest. The value of those rights has been estimated at over $55 million. *See* 11 App. 4114.

**34.** Plaintiff also contends that it is not reasonable to expend $3 million on improvement of its property in light of the low market value of the property. The Court rejects this argument. In

Similarly, plaintiff denies that there is any possibility of selling its air rights to raise revenue.[33] Plaintiff relies primarily on the assertion that it has not had any offers to buy those rights. In fact, interest in purchasing those rights was expressed in a written submission to the Commission. *See* 16 App. 5727. It also appears that interest in the development rights was expressed in the past, but was not pursued by the Church. *See id.* at 5678, 5582–85. Thus, the Court finds that sale of the Church's air rights presents a reasonable method of alternative fund raising that must be explored before a claim of financial hardship can be supported.[34]

In sum, the Court finds that the Church has failed to show that it cannot afford to pay for the cost of necessary repairs to the church and the community house. It follows that plaintiff has failed to show that its financial situation precludes it from restoring its property and carrying out its religious mission and charitable purpose. Therefore the Court finds, as a matter of fact, that the Church has failed to prove that its community house is inadequate for the purposes to which it is devoted, that the Church has failed to prove that it is incapable of carrying out its charitable purpose within those facilities, and that although those facilities do require some repair and rehabilitation, the Church has failed to show that it cannot afford to pay for those necessary repairs and rehabilitation.

## CONCLUSION

Since plaintiff has failed to show by a preponderance of the evidence that it can

support of this argument plaintiff submitted the testimony and report of Brown, Harris, Stevens, Inc. *See* 2 App. 525, 4 App. 1247, 11 App. 4059, 15 App. 5287. However, Brown, Harris, Stevens estimated that after necessary repairs the community house would have a market value, as landmarked, of approximately $15 million, and that the church would have a market value, as landmarked, of $20 million, for a total landmarked value of $35 million. *See* 11 App. 4063. The Court finds that $3 million is a wholly reasonable sum for repairs in light of plaintiff's own estimated value of the properties, an estimate which the Committee to Oppose corroborated. *See* 3 App. 826.

no longer conduct its charitable activities or carry out its religious mission in its existing facilities, plaintiff's First and Fifth Amendment claims must be rejected. The clerk is directed to enter judgment for the defendants and close the above-captioned action.

It is SO ORDERED.