The RECTOR, WARDENS, AND MEMBERS OF the VESTRY OF ST. BARTHOLOMEW'S CHURCH, Plaintiff-Appellee (Re: 88–7751), Plaintiff-Appellant (Re: 90–7101),

v.

The CITY OF NEW YORK and the Landmarks Preservation Commission of the City of New York, Defendants–Appellees (Re: 88–7751, 90–7101).

Appeal of The COMMITTEE TO OPPOSE the SALE OF ST. BARTHOLOMEW'S CHURCH INCORPORATED, J. Sinclair Armstrong, Robert E. Morris, Jr., Doris Capp Stass, George H. Weiler, III, Madeline Calder, Beatrice Lotz, Bromwell Ault, Jr., Neal Goldman, and Charlotte Pierce Armstrong, (Re: 88–7751).

Nos. 1431, 1432, Docket 88–7751, 90–7101.

United States Court of Appeals, Second Circuit.

Argued July 17, 1990.

Decided Sept. 12, 1990.

**350**

Douglas M. Parker, New York City (Judah Gribetz, Howard W. Goldstein, George A. Peirce, Mudge Rose Guthrie Alexander & Ferdon, Henry P. Monaghan, Kent Greenawalt, James G. Glazebrook, New York City, of counsel), for plaintiff-appellee (Re: 88–7751), plaintiff-appellant (Re: 90–7101).

Elizabeth Dvorkin, New York City (Victor A. Kovner, Corp. Counsel of the City of New York, Leonard Koerner, Jonathan L. Pines, Dorothy Miner, New York City, of counsel), for defendants-appellees (Re: 88–7751 and 90–7101).

Gerald D. Fischer, New York City, for appellants (Re: 88–7751), amici curiae Committee to Oppose the Sale of St. Bartholomew's Church Inc., J. Sinclair Armstrong, Robert E. Morris, Jr., Doris Capp Stass, George H. Weiler, III, Madeleine Calder, Beatrice Lotz, Bromwell Ault, Jr., Neal Goldman and Charlotte Pierce Armstrong (Re: 90–7101).

Donald G. Glascoff, Jr., Robert Knuts, Cadwalader, Wickersham & Taft, New York City, for amici curiae New York State Interfaith Com'n on Landmarking of Religious Property, Council of Churches of the City of New York, Inc., Queens Federation of Churches, New York State Council of Churches, Nat. Council of Churches of Christ in the U.S.A., Nat. Ass'n of Evangelicals, Baptist Joint Committee on Public Affairs, Evangelical Lutheran Church in America, New York Bd. of Rabbis, Dept. of Church in Soc., Div. of Homeland Ministries, Christian Church (Disciples of Christ), and Americans United for the Separation of Church and State (Re: 90–7101).

Lee Boothby, Boothby, Ziprick & Yingst, Berrien Springs, Michigan, for amicus curiae Council on Religious Freedom (Re: 90–7101).

George J. McCormack, Cusak & Stiles, New York City, Kevin M. Kearney, Hurley, Kearney & Lane, Brooklyn, New York, for amici curiae Roman Catholic Archdiocese of New York, Roman Catholic Diocese of Brooklyn, and New York State Catholic Conference (Re: 90–7101).

Frank Patton, Jr., Ellis, Stringfellow & Patton, New York City, for amicus curiae Church of St. Paul and St. Andrew (Re: 90–7101).

John J. Kerr, Jr., Elizabeth P. Johnson, Nancy B. Mallery, Simpson Thacher & Bartlett, New York City, for amici curiae Nat. Trust for Historic Preservation, National Center for Preservation Law, New York Landmarks Conservancy, Preservation Action, Fine Arts Federation, Preservation League of New York State, and Women's City Club of New York, Inc. (Re: 90–7101).

William E. Hegarty, Howard G. Sloane, Cahill, Gordon & Reindel, New York City, for amicus curiae Municipal Art Soc. of New York, Inc. (Re: 90–7101).

Before WINTER and WALKER, Circuit Judges, and MUKASEY,* District Judge.

WINTER, Circuit Judge:

This appeal poses the question of whether a church may be prevented by New York City's Landmarks Law, now codified at New York City Administrative Code Sections 25–301 to 25–321 (1986), from replacing a church-owned building with an office tower. The question implicates both First and Fifth Amendment issues. Specifically, the Rector, Wardens, and Members of the Vestry of St. Bartholomew's Church ("the Church") appeal from Judge Sprizzo's decision that the New York City Landmarks

---

* Hon. Michael B. Mukasey, United States District Judge for the Southern District of New York, sitting by designation.

Law, as applied to an auxiliary structure next to the Church's main house of worship, did not impose an unconstitutional burden on the free exercise of religion or effect a taking of property without just compensation.

The district court grounded its decision on its finding that the Church had failed to prove that the landmark regulation prevented the Church from carrying out its religious and charitable mission in its current buildings. We agree that this is the legal standard established by Supreme Court precedent governing both free exercise and takings claims. Moreover, we find no clear error in the district court's factual determinations. We therefore affirm. We also affirm the denial of a motion to intervene by a group of persons opposed to the Church's plans to develop its property.

## BACKGROUND

St. Bartholomew's Church is a Protestant Episcopal Church organized in 1835 under the laws of the State of New York as a not-for-profit religious corporation. The main house of worship ("the Church building") stands on the east side of Park Avenue, between 50th and 51st Streets, in New York City. Constructed beginning in 1917 according to the plans of architect Bertram G. Goodhue, the Church building is a notable example of a Venetian adaptation of the Byzantine style, built on a Latin cross plan. Significant features include its polychromatic stone exterior, soaring octagonal dome, and large rose window. Perhaps most significantly, Goodhue incorporated into his building the Romanesque porch of St. Bartholomew's former Church building at Madison Avenue and 44th Street. Designed by the renowned architectural firm of McKim, Mead & White, the porch is composed of a high arched central portal flanked by two lower arched doorways, all supported by slender columns. The doors themselves are richly decorated bronze, depicting Biblical themes.

Adjacent to the Church building, at the northeast corner of Park Avenue and 50th Street, is a terraced, seven-story building known as the Community House. It is the replacement of this building with an office tower that is at issue in the instant matter. Completed in 1928 by associates of Goodhue, the Community House complements the Church building in scale, materials and decoration. Together with the Church building, the Community House houses a variety of social and religious activities in which the Church is engaged. It contains a sixty-student preschool, a large theater, athletic facilities (including a pool, gymnasium, squash court, and weight and locker rooms), as well as several meeting rooms and offices for fellowship and counseling programs. A community ministry program, which provides food, clothing, and shelter to indigent persons, is operated mainly from the Church building. Meals are prepared in a small pantry on the first floor and served in the mortuary chapel. Ten homeless persons are housed nightly in the narthex.

In 1967, finding that "St. Bartholomew's Church and Community House have a special character, special historical and aesthetic interest and value as part of the development, heritage and cultural aspects of New York City," the Landmarks Preservation Commission of the City of New York (the "Commission") designated both buildings as "landmarks" pursuant to the Landmarks Law. This designation prohibits the alteration or demolition of the buildings without approval by the Commission. *See* N.Y.C. Admin. Code § 25–305(a)(1) (1985).

The Church did not object to the landmarking of its property. In December 1983, pursuant to what is now New York City Administrative Code Section 25–307, the Church applied to the Commission for a "certificate of appropriateness" permitting it to replace the Community House with a fifty-nine story office tower. This request was denied as an inappropriate alteration. In December 1984, the Church filed a second application, scaling down the proposed tower to forty-seven stories. This application was also denied.

The Church thereafter filed a third application under a different procedure. Pursuant to Sections 207–4.0 and 207–8.0 of the

New York City Administrative Code,[1] commonly known as the "hardship exception," it sought a certificate of appropriateness for the forty-seven story tower on the ground of the Community House's present inadequacy for church purposes. The Church's application was the subject of a series of public hearings before the Commission in late 1985 and early 1986. At those hearings, the Commission gathered evidence from various interested parties, including expert testimony and written reports regarding the adequacy of the Community House for the Church's charitable programs, the necessity and cost of structural and mechanical repairs for the Church building and Community House, and the Church's financial condition. Following the public hearings, the Commission convened in Executive Session, open to the public, on several occasions in February 1986. At these meetings the Commission discussed the Church's application, accepted further submissions from interested parties, and took testimony and reports from its own *pro bono* experts. On February 24, the Commission voted to deny the application because the Church had failed to prove the necessary hardship. Several months later the Commission issued a lengthy written determination detailing the reasons for its denial.

On April 8, 1986, the Church brought the instant action for declaratory and injunctive relief and damages pursuant to 42 U.S.C. § 1983. The complaint set forth a host of constitutional claims. It alleged that the Landmarks Law, facially and as applied to the Church, violates both the free exercise and establishment clauses of the First Amendment by excessively burdening the practice of religion and entangling the government in religious affairs. It also alleged that the Landmarks Law violates the equal protection and due process clauses of the Fourteenth Amendment because it applies different standards to charitable and commercial institutions respectively and constitutes a taking of property without just compensation. In addition, the Church alleged a variety of procedural due process violations and brought a pendent state law claim alleging that the Church should have been granted a certificate of appropriateness under New York law.

The Church moved for partial summary judgment on its claims of facial unconstitutionality. Defendants cross-moved for summary judgment on all claims. The district court granted summary judgment to defendants with respect to the issues of facial unconstitutionality only. On the First Amendment claims, the court ruled that the Landmarks Law "creates no more than an incidental burden on the practice of religion" and that entanglement doctrine was not applicable. On the equal protection claim, the court ruled that the different hardship tests applied to charitable and commercial organizations were rational. Finally, it held that the notice and hearing provisions of the Landmarks Law comport with constitutional standards of due process.

The district court then held a bench trial with respect to the claims that the Landmarks Law is unconstitutional as applied to the Church. The parties agreed that the evidentiary record before the district court would be limited to the evidence presented to the Commission, contained in a twenty-three volume appendix. In considering the Church's takings claim, the court adopted the standard articulated by New York State courts: An unconstitutional taking exists "where the landmark designation [of property owned by a charitable organization] would prevent or seriously interfere with the carrying out of the charitable purpose of the institution." *St. Bartholomew's Church v. City of New York*, 728 F.Supp. 958, 966–67 (S.D.N.Y.1989) (opinion and order) (citing *Society for Ethical Cul-*

---

**1.** Now found at Section 25–309, the provision states that a certificate of appropriateness shall be granted to a not-for-profit applicant who shows, *inter alia,* that such

improvement has ceased to be adequate, suitable or appropriate for use for carrying out

both (1) the purposes of such owner to which it is devoted and (2) those purposes to which it had been devoted when acquired unless such owner is not [sic] longer engaged in pursuing such purposes.

N.Y.C.Admin.Code § 25–309(a)(2)(c) (1985).

*ture v. Spatt,* 51 N.Y.2d 449, 454–55, 415 N.E.2d 922, 925, 434 N.Y.S.2d 932, 935 (1980); *Lutheran Church in America v. City of New York,* 35 N.Y.2d 121, 131, 316 N.E.2d 305, 311, 359 N.Y.S.2d 7, 16 (1974)). The district court applied the same test to the claim of an unconstitutional burden on religion. It thus stated, "[I]n this case, the First Amendment inquiry is identical in scope to the Fifth Amendment inquiry, since to prevail on either claim plaintiff must prove that it can no longer carry out its religious mission in its existing facilities." *Id.* 728 F.Supp. at 966–67.

The district court then examined the record before the Commission in order to determine whether the Church had proved by a preponderance of the evidence that it can no longer carry out its charitable purpose in its existing facilities. The district court found that it had not, for three basic reasons. First, it ruled that the Church had failed to demonstrate that the Community House is insufficient to accommodate the various programs currently based there. Second, it found that the Church had exaggerated the cost of the necessary repairs to the structural and mechanical systems of the Church building and Community House. Third, the court held that the Church had failed to prove that it cannot afford to make the necessary repairs and renovations to its buildings. Having concluded that the Church had not carried its burden of demonstrating that the Landmarks Law precludes it from continuing its activities in its existing facilities, the district court rejected the Church's First and Fifth Amendment claims and entered judgment for defendants.[2]

On appeal, the Church renews its free exercise and takings claims and argues that the district court's factual findings were clearly erroneous.

In the course of proceedings, the district court denied a motion to intervene on the side of defendants made by several individual parishioners and the Committee to Oppose the Sale of St. Bartholomew's Church

Incorporated, a group of St. Bartholomew's members and others opposed to commercial development of the Church's property. It held that the proposed intervenors had no ownership interest in the property at issue and that their participation would interfere with the efficient administration of the litigation. *See St. Bartholomew's Church v. City of New York,* No. 86 Civ. 2848 (JES), slip op. (S.D.N.Y. Oct. 27, 1986) (order denying motion to intervene). A year later, after the parties agreed that the trial in the instant action should be conducted solely on the record before the Commission, the proposed intervenors renewed their motion, which was again denied. *See St. Bartholomew's Church v. City of New York,* No. 86 Civ. 2848 (JES), slip op. (S.D.N.Y. Apr. 6, 1988) (order denying motion to intervene). The proposed intervenors appeal from this ruling.

## DISCUSSION

Sections 1 and 2 of this portion of the opinion reject the Church's free exercise and takings claims. Our discussion assumes the affirmance of the district court's factual findings as detailed in section 3.

### 1. *The Free Exercise Claim*

■ The Church argues that the Landmarks Law substantially burdens religion in violation of the First Amendment as applied to the states through the Fourteenth Amendment. In particular, the Church contends that by denying its application to erect a commercial office tower on its property, the City of New York and the Landmarks Commission (collectively, "the City") have impaired the Church's ability to carry on and expand the ministerial and charitable activities that are central to its religious mission. It argues that the Community House is no longer a sufficient facility for its activities, and that the Church's financial base has eroded. The construction of an office tower similar to those that now surround St. Bartholomew's in midtown Manhattan, the Church asserts,

**2.** The district court treated the Church's remaining procedural due process and state law claims as abandoned, because the Church had disa-

vowed any interest in having a new hearing before the Commission, the only relief available to remedy these claims.

is a means to provide better space for some of the Church's programs and income to support and expand its various ministerial and community activities. The Church thus argues that even if the proposed office tower will not house all of the Church's programs, the revenue generated by renting commercial office space will enable the Church to move some of its programs— such as sheltering the homeless—off-site. The Church concludes that the Landmarks Law unconstitutionally denies it the opportunity to exploit this means of carrying out its religious mission. Although the Landmarks Law substantially limits the options of the Church to raise revenue for purposes of expanding religious charitable activities, we believe the Church's claims are precluded by Supreme Court precedent.

As the Court recently stated in *Employment Division v. Smith*, —— U.S. ——, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), the free exercise clause prohibits above all " 'governmental regulation of religious *beliefs* as such.' " *Id.* 110 S.Ct. at 1599 (quoting *Sherbert v. Verner*, 374 U.S. 398, 402, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965 (1963) and citing cases). No one seriously contends that the Landmarks Law interferes with substantive religious views. However, apart from impinging on religious beliefs, governmental regulation may affect conduct or behavior associated with those beliefs. Supreme Court decisions indicate that while the government may not coerce an individual to adopt a certain belief or punish him for his religious views, it may restrict certain activities associated with the practice of religion pursuant to its general regulatory powers. For example, in *Smith* the Court held that the free exercise clause did not prohibit the State of Oregon from applying its drug laws to the religious use of peyote. *See* 110 S.Ct. 1595. *Cf. United States v. Lee*, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982).

The synthesis of this caselaw has been stated as follows: "[T]he right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).' " *Smith*, 110 S.Ct. at 1600 (quoting *Lee*, 455 U.S. at 263 n. 3, 102 S.Ct. at 1058 n. 3 (Stevens, J., concurring)). The critical distinction is thus between a neutral, generally applicable law that happens to bear on religiously motivated action, and a regulation that restricts certain conduct because it is religiously oriented. *See id.* 110 S.Ct. at 1599.

■ The Landmarks Law is a facially neutral regulation of general applicability within the meaning of Supreme Court decisions. It thus applies to "[a]ny improvement, any part of which is thirty years old or older, which has a special character or special historical or aesthetic interest or value." N.Y.C.Admin.Code § 25–302(n) (1986).

It is true that the Landmarks Law affects many religious buildings. The Church thus asserts that of the six hundred landmarked sites, over fifteen percent are religious properties and over five percent are Episcopal churches. Nevertheless, we do not understand those facts to demonstrate a lack of neutrality or general applicability. Because of the importance of religion, and of particular churches, in our social and cultural history, and because many churches are designed to be architecturally attractive, many religious structures are likely to fall within the neutral criteria—having "special character or special historical or aesthetic interest or value"—set forth by the Landmarks Law. N.Y.C.Admin.Code § 25–302(n) (1986). This, however, is not evidence of an intent to discriminate against, or impinge on, religious belief in the designation of landmark sites.

The Church's brief cites commentators, including a former chair of the Commission, who are highly critical of the Landmarks Law on grounds that it accords great discretion to the Commission and that persons who have interests other than the preservation of historic sites or aesthetic structures may influence Commission de-

cisions.[3] Nevertheless, absent proof of the discriminatory exercise of discretion, there is no constitutional relevance to these observations. Zoning similarly regulates land use but it is hardly a process in which the exercise of discretion is constrained by scientific principles or unaffected by selfish or political interests, yet it passes constitutional muster. *See Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926).

The Church argues that landmarking and zoning differ in that landmarking targets only individual parcels while zoning affects larger segments. However, the Landmarks Law permits the designation of historic districts, *see* N.Y.C.Admin.Code § 25–303(a)(4) (1986), while all zoning laws provide for variances for individual sites. Even if the two forms of regulation bear the different characteristics asserted by the Church, those differences are of no consequence in light of *Penn Central Transportation Company v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). There, the Court stated:

> [L]andmark laws are not like discriminatory, or 'reverse spot,' zoning: that is, a land-use decision which arbitrarily singles out a particular parcel for different, less favorable treatment than the neighboring ones. In contrast to discriminatory zoning, which is the antithesis of land-use control as part of some comprehensive plan, the New York City law embodies a comprehensive plan to preserve structures of historic or aesthetic interest wherever they might be found in the city....

*Id.* at 132, 98 S.Ct. at 2663 (citation omitted).

■ It is obvious that the Landmarks Law has drastically restricted the Church's ability to raise revenues to carry out its various charitable and ministerial programs. In this particular case, the revenues involved are very large because the Community House is on land that would be extremely valuable if put to commercial uses. Nevertheless, we understand Supreme Court decisions to indicate that neutral regulations that diminish the income of a religious organization do not implicate the free exercise clause. *See Jimmy Swaggart Ministries v. Board of Equalization*, — U.S. —, 110 S.Ct. 688, 107 L.Ed.2d 796 (1990); *Hernandez v. Commissioner*, — U.S. —, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989). The central question in identifying an unconstitutional burden is whether the claimant has been denied the ability to practice his religion or coerced in the nature of those practices. In *Lyng v. Northwest Cemetery Protective Ass'n*, 485 U.S. 439, 108 S.Ct. 1319, 1326, 99 L.Ed.2d 534 (1988), the Court explained,

> It is true that ... indirect coercion or penalties on the free exercise of religion, not just outright prohibitions, are subject to scrutiny under the First Amendment.... This does not and cannot imply that incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs, require government to bring forward a compelling justification for its otherwise lawful actions. The crucial word in the constitutional text is "prohibit" ...

We agree with the district court that no First Amendment violation has occurred absent a showing of discriminatory motive, coercion in religious practice or the Church's inability to carry out its religious mission in its existing facilities. *Cf. Yonkers Racing Corp. v. City of Yonkers*, 858 F.2d 855, 872 (2d Cir.1988).

In sum, the Landmarks Law is a valid, neutral regulation of general applicability, and as explained below, we agree with the district court that the Church has failed to

---

**3.** The Landmarks Law made a cameo appearance in a recent best-selling novel as a vehicle for political retaliation against a clerical official seeking to develop Church property. *See* T. Wolfe, *Bonfire of the Vanities* 569 (1987) ("Mort? You know that church, St. Timothy's? ... Right ... LANDMARK THE SON OF A BITCH!").

prove that it cannot continue its religious practice in its existing facilities.[4]

### 2. *The Takings Claim*

■ The Church also claims that the Landmarks Law so severely restricts its ability to use its property that it constitutes confiscation of property without just compensation in violation of the Fifth and Fourteenth Amendments.[5] However, the Supreme Court's decision in *Penn Central* compels us to hold otherwise.

In *Penn Central*, the Supreme Court held that the application of New York City's Landmarks Law to Grand Central Terminal did not effect an unconstitutional taking. *See* 438 U.S. at 138, 98 S.Ct. at 2666. That famous beaux arts style train station, located in midtown Manhattan (just eight blocks from St. Bartholomew's Church) was designated a landmark in 1967. *See id.* at 115–16, 98 S.Ct. at 2654–55. Shortly thereafter, Penn Central Transportation Company ("Penn Central"), principal owner of the Terminal, in order to increase its income, sought to build a high-rise office tower atop the Terminal. The Landmarks Commission, however, denied the proposal because " '[q]uite simply, the tower would overwhelm the Terminal by its sheer mass.' " *Id.* at 118, 98 S.Ct. at 2656 (quoting the record on appeal). The Supreme Court squarely rejected Penn Central's claim that the building restriction had unconstitutionally "taken" its property. Central to the Court's holding were the facts that the regulation did not interfere with the historical use of the property and that that use continued to be economically viable:

> [T]he New York City law does not interfere in any way with the present uses of the Terminal. Its designation as a landmark not only permits but contemplates that appellants may continue to use the property precisely as it has been used for the past 65 years: as a railroad terminal containing office space and concessions. So the law does not interfere with what must be regarded as Penn Central's primary expectation concerning the use of the parcel. More importantly, on this record, we must regard the New York City law as permitting Penn Central not only to profit from the Terminal but also to obtain a "reasonable return" on its investment.

*Id.* at 136, 98 S.Ct. at 2665.

Applying the *Penn Central* standard to property used for charitable purposes, the constitutional question is whether the land-use regulation impairs the continued operation of the property in its originally expected use. We conclude that the Landmarks Law does not effect an unconstitutional taking because the Church can continue its existing charitable and religious activities in its current facilities. Although the regulation may "freeze" the Church's property in its existing use and prevent the Church from expanding or altering its activities, *Penn Central* explicitly permits this. In that case, the Landmarks Law diminished the opportunity for Penn Central to earn what might have been substantial amounts by preventing it from building a skyscraper

---

**4.** The Church also argues that the Landmarks Law involves an excessive degree of entanglement between church and state in violation of the establishment clause. The district court dismissed this argument as irrelevant in the present context, reasoning that the entanglement doctrine applies only to instances of government funding of religious organizations. However, in *Jimmy Swaggart Ministries* the Supreme Court considered an entanglement claim in the context of government taxation of the sale of religious materials by a religious organization. The Court found no constitutional violation, as the regulation imposed only routine administrative and recordkeeping obligations, involved no continuing surveillance of the organization, and did not inquire into the religious doctrine or motives of the organiza-

tion. *See* 110 S.Ct. at 697–99. These same factors are of course largely true of the Landmarks Law. The only scrutiny of the Church occurred in the proceedings for a certificate of appropriateness, and the matters scrutinized were exclusively financial and architectural. This degree of interaction does not rise to the level of unconstitutional entanglement.

**5.** The Fifth Amendment provides in part, "nor shall private property be taken for public use, without just compensation," U.S. Const. amend. V, and is applicable to the states through the Fourteenth Amendment. *See Chicago, B. & Q. R. Co. v. Chicago*, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897).

atop the Terminal. Here it prevents a similar development by the Church—one that, in contrast to the proposal to build an office tower over Grand Central Terminal, would involve the razing of a landmarked building—at least so long as the Church is able to continue its present activities in the existing buildings. In both cases, the deprivation of commercial value is palpable, but as we understand *Penn Central*, it does not constitute a taking so long as continued use for present activities is viable.

The Church offers several arguments to distinguish *Penn Central*, but we find them unavailing. First, it argues that while Penn Central stipulated that it was able to earn a "reasonable return" on the Terminal even under the regulation, *see* 438 U.S. at 129, 98 S.Ct. at 2662, in this case, the use of the Community House for commercial purposes would yield an estimated return of only six percent. Even if true, this fact is irrelevant. "Reasonable return" analysis was appropriate to determine the viability of the existing commercial use of the Terminal but has no bearing on the instant matter because the existing use of the Community House is for charitable rather than commercial purposes. So long as the Church can continue to use its property in the way that it has been using it—to house its charitable and religious activity—there is no unconstitutional taking.

Second, the Church notes that it presented a second proposal for a smaller building to the Commission, but Penn Central did not. This hardly makes any difference. Just as the Commission in *Penn Central* remained open to a building addition that " 'would harmonize in scale, material and character,' " 438 U.S. at 137, 98 S.Ct. at 2666 (quoting record on appeal), with the Terminal, it invited appellant to propose an addition to the Community House in the instant matter. Finally, we reject as un-

supported appellant's argument that in *Penn Central* the property owner continued to enjoy valuable, transferrable rights to develop the airspace above the Terminal, *see* 438 U.S. at 137, 98 S.Ct. at 2666, while the Church's development rights have little value. *See* Section 3(a) *infra.*[6]

### 3. *Findings of the District Court*

The principal factual finding of the district court—one central to its rejection of the Church's free exercise and takings claims—was that the Church "failed to show by a preponderance of the evidence that it can no longer conduct its charitable activities or carry out its religious mission in its existing facilities." *St. Bartholomew's Church v. City of New York*, 728 F.Supp. 958, 974–75 (S.D.N.Y.1989) (opinion and order).

The Church claims that the Community House is an inadequate facility in which to carry out the various activities that presently comprise the Church's religious mission and charitable purpose. It further claims that it cannot afford to make the needed repairs and renovations to the Community House and Church building. It concludes that it must be allowed to replace the Community House with a revenue-generating office tower. The district court was unconvinced. It found that the Church failed to prove that the Community House is fundamentally unsuitable for its current use and that the cost of repair and rehabilitation is beyond the financial means of the Church. Appellant argues on appeal that these findings were clearly erroneous. Fed.R.Civ.P. 52(a); *Anderson v. Bessemer City*, 470 U.S. 564, 574–75, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985); *Sygma Photo News, Inc. v. High Society Magazine*, 778 F.2d 89, 95–96 (2d Cir.1985). We disagree.

---

**6.** Appellant urges further that application of the Landmarks Law to the Church does not substantially advance a legitimate state interest. *See Nollan v. California Coastal Comm'n*, 483 U.S. 825, 834–35, 107 S.Ct. 3141, 3146–47, 97 L.Ed.2d 677 (1987). While land use restrictions must be reviewed in the context of the individual proper-

ty in question, *see Nectow v. City of Cambridge*, 277 U.S. 183, 48 S.Ct. 447, 72 L.Ed. 842 (1928), the same government interest held to be valid in *Penn Central*—"preserving structures and areas with special historic, architectural or cultural significance," 438 U.S. at 129, 98 S.Ct. at 2662—is equally applicable here.

**358**

### a. Adequacy of the Community House

■ The Church claims that the amount and configuration of usable space in the Community House is insufficient to accommodate the Church's various programs. It relies principally upon an analysis of space in the Community House by Walker Associates, an interior design firm hired by the Church. Presented to the Commission in three written reports and related oral testimony (collectively, "the Walker Report"), this study concluded that the demands for space by the Church's various programs exceeded the capacity of the Community House. Additionally, the Walker Report stated that renovation or expansion was impractical due to the structural inflexibility of the building.

The district court discredited the Walker Report. With regard to space, there is no dispute that the Community House currently is too small. The Walker Report found that 8000 square feet of extra space is needed. The Commission placed the deficiency at about 4500 square feet.[7]

Fatal, however, to the Church's claim is the absence of any showing that the space deficiency in the Community House cannot be remedied by a reconfiguration or expansion that is consistent with the purposes of the Landmarks Law. The Walker Report assumed that the Community House had an outmoded structure that precluded such an option. In fact, the building has a modern, light steel frame structure and was designed so that two additional floors could easily be added. Moreover, the Commission has indicated that it would be receptive to a proposal from the Church for such an addition. While expanding the amount of available space in the Community House may not provide ideal facilities for the Church's expanded programs,[8] it does offer a means of continuing those programs in the existing building. Certainly the intermediate option of limited expansion must be thoroughly explored before jumping to replacement with a forty-seven story office building.

### b. Cost of Repair and Rehabilitation

The Church also argues that the necessary repairs to the physically deteriorating Church building and Community House would be prohibitively expensive. It relies on a study of the mechanical systems and exteriors of those buildings prepared by O'Brien, Krietzburg and Associates, a construction management firm, and submitted to the Commission through written reports and oral testimony (collectively, "the OKA Report"). The OKA Report estimated that it would cost approximately $11 million over two years to bring the buildings' mechanical, electrical, and plumbing systems into proper working order and to repair the buildings' exteriors.

The district court also rejected this conclusion, faulting the OKA Report for being biased in favor of replacement over rehabilitation, ignoring actual conditions at the property site, and using an inappropriate method of estimating costs. Further, the district court pointed to contradictory evidence presented to the Commission, both by persons opposing the proposed development and by neutral consultants. Based on this information, the court found $3 million "phased in over a period of several years" to be a reasonable estimate for repairs and replacement.

On appeal, the Church does not seriously defend the $11 million estimate contained in the OKA Report. Instead, it accepts the $3 million estimate for the work that it covers, but argues that this figure disregards certain "major elements of cost." In particular, the Church asserts that an additional $500,000 is necessary for life safety measures, $647,000 for repair of the church organ, and $360,000 for architectural and engineering fees. The City counters

---

7. The Walker Report determined that the total space required in the Community House is 41,500 square feet, as against 33,500 square feet of available useable space. The Commission accepted the figure for requirements, but estimated the available useable space at approximately 37,000 square feet.

8. For instance, the existing building cannot readily accommodate the larger gymnasium or greater theater wing space sought by the Church.

that the life safety additions would unnecessarily exceed building code requirements, that organ repair is not a proper expense for this proceeding, and that design fees would be negligible.

We need not rule on this dispute over approximately $1.5 million because it is not crucial to the district court's operative factual finding. As our discussion in the next section indicates, even if the potential cost of repairs totaled $4.5 million, the Church has not adequately demonstrated that it is unable to meet this expense. Thus, the district court's central finding that the Church had failed to prove that it cannot continue in its existing facilities does not hinge on whether any portion of this $1.5 million was excluded from its estimate of repair costs.

c. The Church's Finances

As a corollary to its claim that repair and rehabilitation of the Church building and Community House would be too costly, the Church argues that its financial condition does not allow it to make the necessary improvements and also continue its other programs. The district court, however, found that appellant had failed adequately to prove this assertion, a finding that is not clearly erroneous.

The Church has three primary sources of support and revenue: contributions in the form of pledges and offerings collected at worship services, income earned on investments, and fees charged for participation in activities conducted under its sponsorship. Investment income is derived from the Church's investment portfolio, known as the Consolidated Church Fund, the value of which stood at nearly $11 million at the end of 1984. The principal of this endowment consists of funds received as gifts or bequests. In addition, the Church's endowment includes a Properties Fund, representing resources in Church-owned property at acquired cost, net of depreciation, and a miscellaneous General Fund. Combined, these funds totalled just under $3.5 million at the end of 1984, giving the Church an overall endowment of about $14.3 million at that time. Over the decade preceding 1985, the Church's sources of revenue have sporadically kept pace with expenses, exceeding them in 1975, 1977, 1980, 1983 and 1984, and falling behind in 1976, 1978, 1979, 1981, and 1982. On the whole, the Church had only a slight net deficit over this period.

The Church's principal argument is that a major improvement expenditure of the type required to repair and renovate the Church building and Community House would severely damage this "precarious" balance of revenues and expenses. Because such an expenditure would come from endowment funds, the Church contends, future investment income will inevitably decline as the result of a depleted portfolio. Such a decrease in future revenues, it concludes, will produce "severe deficits."

█ While a reduced principal will yield less investment income, the Church has not demonstrated that its budget cannot withstand building improvement expenditures under a reasonable financing procedure. For example, as the district court noted, withdrawals from the endowment might be made gradually to minimize lost investment income, or the Church might borrow against its endowment, and repay the loan over an extended period of time. Appellant has offered no financial projections or cash flow analyses to prove that these financing methods are not feasible. Without such data, the district court's finding that the Church failed to prove prospective financial hardship is not clearly erroneous.

We also cannot ignore the paucity of evidence offered by the Church to show that other forms of revenue are not available. Its claim that a capital fundraising drive already has been exhausted as a financing possibility is undercut by evidence that longtime members of the congregation cannot recall any such drive. Also, evidence before the Commission indicated that the transferrable development rights for the airspace above the Church property are, contrary to the Church's claim, not worthless.

Finally, the Church argues that even if its endowment could withstand a building

project, it is not at liberty to withdraw large sums for that purpose because of legal restrictions on the use of its investment funds. In particular, it urges that Section 717 of the New York Not–For–Profit Corporation Law prohibits the Church from expending the sums necessary to undergo a building project. That provision, however, does no more than impose upon the Church a fiduciary duty of care to manage the congregation's money in a prudent and responsible fashion, *see* N.Y. Not–for–Profit Corp. Law §§ 513, 717 (McKinney Supp.1990), and would be implicated only if the expenditures in question would unacceptably impair the Church's financial condition.[9]

*4. The Motion to Intervene ·*

██ The proposed intervenors argue that the district court should have granted their motion to intervene on the side of the defendants at trial. We may reverse the denial of a motion to intervene only for "abuse of discretion." *See United States v. Hooker Chemical & Plastics,* 749 F.2d 968, 990 (2d Cir.1984). No such abuse is present here. The district court properly denied intervention as of right under Fed. R.Civ.P. 24(a)(2) because the proposed intervenors lack any legally protectable interest in this matter. Under New York law, as a Protestant Episcopal Church, St. Bartholomew's is a corporate body placed in the trusteeship of its church wardens and vestrymen. *See* New York Religious Corporation Law § 41 (McKinney Supp.1990). To the extent that the proposed intervenors are members of the parish, they enjoy only the right to vote in the election of the church wardens and vestrymen. *See id.* § 43. Thus, the Rector, Wardens and Members of the Vestry is the proper party to litigate the constitutionality of encumbrances placed on Church property.

Nor did the district court abuse its discretion by denying permissive intervention

under Rule 24(b). It was eminently reasonable to conclude that intervention only would complicate the litigation, and thereby "unduly delay ... the adjudication of the rights of the original parties." Fed.R. Civ.P. 24(b).

## CONCLUSION

For the reasons stated above, we affirm both the judgment of the district court in favor of the defendants-appellees and the order of that court denying the motion to intervene.

---

**9.** Although the Church also points to Section 513 of the Not–for–Profit Corporation Law, which deals with the administration of assets received for specific purposes, *see* N.Y. Not–for–Profit Corp. Law § 513 (McKinney Supp.1990), it concedes that donor-imposed restrictions are not a "principal constraint" preventing the improvement of its property. It does not challenge the district court's finding that enough of the Church's funds are unrestricted so as to allow it to undertake a building project.